JONES, Chief Judge,
delivered the opinion of the court:
This is a congressional reference case. Plaintiff’s petition was filed pursuant to House Resolution 193, 84th Congress, which was passed on April 19, 1955, and is as follows:
Resolved, That the bill (H. R. 2266) entitled “A bill for the relief of Maurice Mumford,” together with all accompanying papers, is hereby referred to the United States Court of Claims pursuant to sections 1492 and 2509 of title 28, United States Code; and said Court shall proceed expeditiously with the same in accordance with the provisions of said sections and report to the House, at the earliest practicable date, giving such findings of fact and conclusions thereon as shall be sufficient to inform the Congress of the nature and character of the demand, as a claim legal or equitable, against the United States, and the amount, if any, legally or equitably due from the United States to the claimant.
*331 The bill which is set out below,[1] if enacted, would have authorized the Secretary of the Treasury to pay the plaintiff the sum of $21,250 as compensation for damages which he alleges were caused by the reckless removal by the Navy of classified equipment from 17 aircraft that had been sold and delivered to the plaintiff.
The plaintiff claims that in removing the equipment after delivery the defendant violated the Fourth Amendment to the Constitution of the United States which forbids unlawful searches and seizures, and the Fifth Amendment which forbids the taking of private property for public use without just compensation.
The defendant asserts that it took nothing of value from the plaintiff, that no damage was shown, that in fact the removal of classified equipment increased rather than diminished the value of the aircraft for non-military purposes, and that such equipment was carefully removed.
The evidence was taken before one of our trial commissioners, Currell Vance, who heard the witnesses and examined the documents in the case.
We adopt his findings, which are as follows:
1. At the time of the matters complained of in the petition, Potomac Aircraft Corporation was a corporation whose stock was held by the following stockholders: David P. Godwin, Plarold C. King, Maurice Mumford, Fred Ellis, and Richard F. Fincke. Of these stockholders, Mumford, Fincke, and Ellis were preferred stockholders, and privileged participants in the assets of the corporation in the event of liquidation.
Prior to the dissolution of Potomac Aircraft Corporation, Fincke assigned his preferred stock to Robert M. Haar. Both *332 Fincke and Haar, sometime preferred stockholders in Potomac, appear later in the chain of title of the aircraft purchased, as hereinafter shown. Prior to the sale of the aircraft by Potomac, as set out below, plaintiff had acquired control of all of Potomac’s capital stock. Plaintiff is the real party in interest herein.
2. On July 18,1946, the United States of America, acting by and through the War Assets Administration, sold to United States Supply Company, Inc., 17 TBM1C and TBM3E aircraft, identified by the following serial numbers: 17081, 25065, 25511, 45797, 45811, 45890, 46070, 46179, 46223, 46226, 46412, 69481, 73177, 73294, 73338, 73342, and 73484.
The United States Supply Company, Inc., a corporation owned by Mumford, except for certain qualifying shares, sold said aircraft to said Mumford, individually, on June 26,1946. He in turn sold said aircraft to Potomac Aircraft Corporation on July 18,1946. Potomac sold them to Bobert M. Haar on March 19, 1947. Haar sold them to Richard F. Fincke on September 30, 1947, and Fincke sold them to Cobell Industries, Inc., September 8, 1948.
3. Each time title to the aircraft was transferred, the transfer was for value received. The consideration shown in the transfer to the United States Supply Company, Inc., was $1,250 per plane. The consideration received by United States Supply Company, Inc., for its transfer to Maurice Mumford was $1,250 per plane. Mumford received as consideration for his transfer to Potomac 225 shares of preferred stock, par value $22,500, and 720 shares of common stock of Potomac. In the transfer from Robert M. Haar to Fincke, the consideration shown was $1,250 as originally typed. A line had been drawn through this amount and the words “value received RMH” written in.
The consideration of the sale from Potomac to Haar on March 19,1947, according to plaintiff’s testimony, was $1 per plane.
4. The 17 aircraft were flown by the Navy Department to the Naval Air Station, Clinton, Oklahoma, during the months of September, October, and November 1945 and January and May 1946, for delivery to the War Assets Ad *333 ministration. Mumford did not inspect the aircraft or their equipment there, but bought them in the name of United States Supply Company, after a review of the records and a study of their engine hours. He did not see the 17 aircraft until late or middle 1947.
5. On January 14, 1946, Navy Aviation Circular Letter No. 1-46 was issued. This circular noted that on numerous occasions holding activities, in transferring aircraft as surplus, had not removed critical and classified equipment not required for flight delivery to a Naval receiving activity, and ordered that all such classified equipment and critical materials not necessary for flight delivery be removed by the holding activity prior to said flight. To supplement this order, authority was given Navy Inspectors to visit the War Assets Administration Aircraft Sales Storage Depots for the purpose of locating such confidential and restricted equipment.
The Bureau of Aeronautics, Navy Department, letter of August 21, 1946, to the Naval Air Station, New Orleans, Louisiana, issued the following instructions:
Whenever any Navy aircraft in the custody or under the control of a civilian owner is discovered to have in it or on it classified equipment or material of any kind, request should be made for the removal of such material and the delivery of it to an officer or employee of the United States. It makes no difference whether the aircraft was lawfully or unlawfully acquired by the present civilian owner, nor does it matter whether he intended to acquire the classified material along with the purchased plane or even actually bargained for the same. If he refuses to do so upon penalty of violating the Espionage Act (50 U. S. C. 31), which provides that any person who lawfully or unlawfully has possession of any instrument or appliance relating to the national defense is subject to imprisonment and fine for failing to deliver the same on demand by an employee or officer of the United States entitled to receive it. [sic] Since the classified material is not apt to be of any use or value to a civilian owner of the aircraft, and doubtless was not even considered as a part of the purchase price, reimbursement for its removal will probably not be requested. If requested, however, it would still seem unnecessary to make any partial reimbursement for the forfeited material in view of the fact that the Federal *334 Act makes unlawful the retention of any instrument or appliance relating to the national defense.
6. During tbe latter part of 1946, in pursuance of the foregoing instructions, a Navy crew, under the direction of Lt. Comdr. C. L. Aiken, removed classified equipment from eight of the aircraft purchased by plaintiff and belonging to Potomac. When Commander Aiken first sent his team to inspect the aircraft belonging to Potomac, they were refused permission to board the aircraft by the person in charge for Potomac. The following day, Commander Aiken himself requested permission to board and inspect the aircraft and was permitted to do so. Permission was given by the person in charge without coercion being placed upon him, and no force was used by any of the Navy personnel in boarding the aircraft and removing classified material from eight of them.
Only classified material and obsolete bombing equipment was removed from the eight aircraft and nothing from the remaining nine. A full and complete list of the articles removed from the eight aircraft is to be found in plaintiff’s exhibit 27. Specifically, there was nothing removed from the aircraft numbered 25065, 46179, 73484, 73338, 45811, 45890, 73294, 73177, and 69481. From aircraft numbered 46226, two 18-inch whip antennas, used in connection with identification friend or foe equipment, apparatus exclusively military in nature, were removed. From aircraft numbered 46412, one such antenna was removed. From aircraft 45797, one selector switch, used to set off destructive charges in the event the plane went down in enemy territory, was removed. From aircraft numbered 73342, five units of the stabilized bombing approach system and an IFF 18-inch whip antenna were removed. From aircraft numbers 25511 and 17081, units of the stabilized bombing approach system were removed. This equipment is used to guide the airplane during the bombing approach and indicate the proper release point for bombs and torpedoes. From aircraft numbered 46070, a control box used to operate the IFF system and an IFF 18-inch whip antenna were removed. From aircraft numbered 46223, an IFF receiver-transmitter, antenna and control box, and a second radio receiver and antenna, used *335 in military navigation, were removed. None of the equipment removed had any possible commercial application.
7. The orders under which Commander Aiken accomplished his task required that he remove the equipment without damage so that it could be used again, and that it be tagged and stored in locked, guarded vaults. All articles were removed with the greatest care, with special tools and without damage to the article or aircraft, by a crew of competent technicians. This was accomplished within the time limitation of a few hours under the system arranged by Commander Aiken for the removal, tagging, and storage of the articles, and under his supervision.
8. All articles removed were exclusively military in their usefulness, and their removal occasioned no loss of value in the commercial use of the aircraft but rather tended to increase the commercial value by decreasing the gross weight and increasing the volume available for passengers and cargo.
9. After plaintiff took delivery of the planes at Clinton, Oklahoma, they were stored by him for several months on a tract of land privately owned. The owner was employed generally to maintain a watch over said aircraft. During the months in question there was considerable vandalism of planes in this general area, and it is possible that plaintiff’s aircraft were subjected to vandalism by unknown persons.
10. Plaintiff had intended to do certain remodeling work on said aircraft at an estimated cost of $7,000 per plane, in order to adapt them for transporting pipe. He testified that the vandalism to which the planes were subjected rendered them useless for this project, and that consequently they were sold for $1 per plane.
Notwithstanding such testimony, the ultimate purchaser of the aircraft spent about $7,000 per plane in reconditioning them, and thereafter sold them for the sum of $19,000 each.
The following excerpt from plaintiff’s testimony on cross-examination, in question and answer 123 on page 39 of the transcript, is rather revealing, as follows:
123XQ. What were they sold to them for ?
A. They sold the airplanes for, my recollection is *336 $19,000 apiece. If I may add — I could have done the same thing if this had not happened.
In view of the circumstances outlined above, the sale of the aircraft by plaintiff for $1 per plane to a former business associate is not adequately explained, and does not seem to show on plaintiff’s part a proper effort to minimize his damage, if any.
11. The proof fails to show any act by the defendant which was either unauthorized or which reduced the value for commercial purposes of. the aircraft purchased by the plaintiff.

Recommendation

It appears from the foregoing and from the testimony in the case that the classified articles were removed with great care under strict orders; that special tools were used; that the removals were all made within the period of a few hours’ operation; that the articles removed were of value for military use only; that the removal caused no loss but rather tended to increase the commercial value by decreasing the gross weight of the aircraft involved and increasing the volume available for passengers and cargo; that the plaintiff bought the planes without seeing them; that they were kept in the open for some months thereafter; that no proof was offered of the difference in value before and immediately after the classified equipment was removed; that various sales and cross-sales were made between concerns which plaintiff either owned or in which he had or was given stock and between individuals closely associated with plaintiff; that the final sale was made to a former business associate by the concern in which both seller and buyer had stock, and that the latter, after an average expenditure of $7,000 per plane, sold the planes for an average price of $19,000 per plane; that the plaintiff sold the planes for $1 each when he himself stated that he could have sold them for scrap for $236 per plane, and that there was an active scrap operation just across the road from where the planes were located.
This almost incredible story, as found by the court’s commissioner, is fully supported by the evidence.
Since there is a failure of proof of actual damage from the removal operation, and no satisfactory explanation of *337 the elaborate maze of transfers and retransfers between mutually interested persons and organizations, we find that there is a failure to prove any right on the part of plaintiff to recover anything from the defendant on either a legal or an equitable basis.
This opinion and the findings of fact will be certified to the Congress pursuant to House Resolution 193 as set out above.
LaRamoRe, Judge; Maddest, Judge; Whitaker, Judge; and Littleton, Judge, concur.

 Be it enacted by the Senate and Mouse of Representatives of the United States of America in Congress assembled3 That the Secretary of the Treasury is authorized and directed to pay, out of any money in the Treasury not otherwise appropriated, to Maurice Mumford, Washington, District of Columbia, the sum of $21,250. Such sum represents the damages sustained by the said Maurice Mumford as the result of the destruction by Navy personnel of seventeen aircraft that had been purchased by the said Maurice Mumford (doing business as United States Supply Company) from the War Assets Administration. Such destruction was caused by the reckless removal from such aircraft of “classified” equipment that the Navy had neglected to remove prior to declaring such aircraft surplus, and such removal rendered such aircraft unflyable and useless. The claim of the said Maurice Mumford is not a claim that is cognizable under the Federal Tort Claims Act.